**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

BUCKS HOLSTERS LLC,

Plaintiff,

v.

T5 INVESTMENTS LLC d/b/a
TYSON HOLSTERS, TREVIN TYSON, and
DEMARKUS DRUMWRIGHT,

Defendants.

**Case No.:**
**COMPLAINT AND DEMAND FOR JURY TRIAL**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Bucks Holsters LLC ("Buck's"), by and through undersigned counsel, sues Defendants T5 Investments LLC d/b/a Tyson Holsters ("T5"), Trevin Tyson ("Tyson"), individually, and DeMarkus Drumwright ("Drumwright"), individually, and alleges as follows. T5 and Tyson are referred to collectively as the "Tyson Defendants."

## NATURE OF THE ACTION

1. This action principally concerns Tyson Defendants' unauthorized copying of three Buck's eBay literary works: its CANIK product-advertising text, its SIG AXG Legion product-advertising text, and its earlier eBay About summary (collectively, the 'eBay Works'). Buck's owns three registered copyrights in those works, as particularized in paragraph 95 and documented in Exhibits J-1

through J-3. The alleged infringement forms part of a broader course of competitive conduct involving other copying, confusing commercial presentation, interference with business relationships, and intimidation directed at Buck's owner, employees, and agents. This action also concerns infringement of Buck's source-identifying slogan, first used in January 2026 and allegedly imitated in competing eBay listings within days.

2. The three eBay comparisons are the principal copyright evidence. They show repeated expressive phrasing, sentence structure, and progression, with substitutions for company name, location, guarantee period, clip size, or material. Count I addresses the protectable expression in each eBay Work within the scope of the corresponding application, deposit, and registration. The additional website, employment-advertising, trade-show, and promotional comparisons are pleaded as supporting examples of Tyson Defendants' alleged ongoing efforts to imitate and appropriate Buck's work and goodwill, subject to the separate elements of the other claims. Buck's alleges that the broader course of conduct extended over approximately four years and across trade-show presentation, printed and promotional materials, e-commerce listings, website content and design, supplier and dealer relationships, and personnel.

3. Tyson Defendants also copied the overall nonfunctional visual presentation of Buck's national trade-show booth, including its table and backdrop

arrangement, coordinated branded surfaces, tall 3D fan display devices, and branded nylon merchandise bags handed out to attendees. After seeing Buck's earlier display, Tyson Defendants also adopted parallel signs, shirts, social-media presentation, and other promotional elements.

4. The alleged course of conduct also includes pressure on the people operating Buck's business. Tyson monitored Ross and the Buck's booth, approached and cornered employees after management left, and allegedly verbally accosted and threatened Ross during a show confrontation. The communications described below include efforts to obtain employee information and to work on 'stealing Erin away from Ross secretly.' On September 27, 2026, Drumwright confronted Buck's representative Devon O'Grady at the Fort Worth Gun Show, instructed him to tell Ross to 'lay off my boss,' and used the words and manner described below. Buck's alleges these incidents as intimidation tactics aimed at its owner, employees, and agents in connection with the competitive dispute, based on each defendant's conduct and the agency relationships alleged below.

5. Buck's seeks relief directed to the unlawful copying, confusing commercial presentation, deceptive conduct, and intentional interference described below. Buck's does not seek to monopolize functional holster features, common industry terms, lawful price competition, or the right to sell competing holsters.

## PARTIES

6. Plaintiff Bucks Holsters LLC is a Florida limited liability company with its principal place of business in Cape Coral, Lee County, Florida. Ross J. Boeder is its authorized member.

7. Boeder began using the BUCKS HOLSTERS name in commerce for holsters by at least 2016 through the business that preceded Bucks Holsters LLC. Bucks Holsters LLC succeeded to that business and its associated goodwill, content, records, and intellectual-property rights.

8. Defendant T5 Investments LLC is a Virginia limited liability company with its principal place of business in King William, Virginia. It conducts business under the name Tyson Holsters.

9. Defendant Trevin Tyson is an individual residing in King William County, Virginia. Tyson owns and operates T5's Tyson Holsters business. He is sued in his individual capacity because he personally directed, authorized, approved, participated in, and benefited from the conduct alleged here, including the copying and publication of Buck's content and the interference with Buck's personnel and business relationships.

10. Defendant DeMarkus Drumwright is an individual whose last known domicile and service address was 6038 Mojave Drive, Forney, TX 75126. Upon information and belief, throughout the relevant period and continuing to the present, Drumwright was and is an agent, representative, and/or apparent

agent of T5 and Tyson Holsters; represented Tyson Holsters at numerous trade shows; and acted within the course and scope of that relationship in the conduct alleged below.

11. T5 publicly claims that Tyson Holsters was established in 2021 and upon information and belief, owns the federal TYSON HOLSTERS trademark registration in the name of T5 Investments LLC.

12. On August 3, 2026, T5 and Tyson filed T5 Investments LLC d/b/a Tyson Holsters et al. v. Wildcat Holsters et al., Case No. 3:26-cv-00765-DJN, in the Eastern District of Virginia. In that pleading, they represented that Tyson owns the business, that Tyson Holsters and a competing holster company market through booths at shows around the country, and that Tyson attends at least 150 shows per year. Those statements corroborate Tyson Defendants' extensive trade-show presence and repeated opportunities to encounter competing displays.

**JURISDICTION AND VENUE**

13. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 because this action arises under the Copyright Act, including 17 U.S.C. § 512(f); the Lanham Act, 15 U.S.C. § 1125(a); and the Defend Trade Secrets Act, 18 U.S.C. § 1836. The unregistered-slogan claim independently arises under Section

43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), with jurisdiction also provided by 15 U.S.C. § 1121.

14. This Court has supplemental jurisdiction over the related Florida-law claims under 28 U.S.C. § 1367 because they derive from the same nucleus of operative facts.

15. T5 and Tyson purposefully direct sales and advertising into Florida through eBay, their website, social media, and trade shows; sell and ship the accused products to Florida customers; and compete with Buck's for Florida customers, employees, and accounts.

16. Tyson personally directed conduct toward Buck's in Florida. His messages show that he tracked Buck's at Pensacola, Tampa, and West Palm Beach shows, sought a Buck's employee's number, and discussed secretly recruiting that employee away from Buck's.

17. Tyson Defendants knew Buck's was a Florida business and knew the injury from their intentional copying and interference would be suffered in Florida. Their Florida-directed acts form a substantial part of the events giving rise to these claims.

18. Upon information and belief, Drumwright represented Tyson Holsters at numerous trade shows and directed the defamatory communications alleged below toward Buck's, a Florida business, and persons in Buck's market.

19. Personal jurisdiction is therefore consistent with Florida's long-arm statute and due process. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1400(a), and the Fort Myers Division is proper because Buck's resides in Lee County and suffered injury there.

## FACTUAL ALLEGATIONS

### A. Buck's Business, Original Content, and Commercial Presentation

20. Buck's designs, manufactures, markets, and sells Kydex and hybrid holsters and related products throughout the United States. Its eBay account dates to April 1999, and the BUCKS HOLSTERS business has operated under that name since at least 2016.

21. Buck's created original text for its eBay storefront and product listings, including the eBay Works identified in paragraph 95. It also developed website and policy prose, employment advertising, and other promotional materials. The three eBay Works are the focus of Count I; the additional materials and conduct supply context for the alleged pattern and, where their separate elements are established, the other claims.

22. Buck's developed a coordinated trade-show presentation for national events. The claimed trade dress is the overall nonfunctional combination of a branded, skirted table perimeter; a rear logo field and backdrop with a dominant central Buck's identifier; coordinated signs; tall freestanding 3D fan

display devices positioned at the booth perimeter; and branded nylon merchandise bags distributed to attendees.

23. Buck's first used that booth presentation at the NRA Outdoors Show in Harrisburg, Pennsylvania, in February and promoted it to consumers and dealers.

24. Buck's also used coordinated banner designs, gun-show signage, tall 3D fan display devices, branded nylon merchandise bags handed out at shows, staff shirts, packaging, and printed materials as part of a consistent commercial image.

25. Buck's also developed a recognizable holster presentation using a coordinated combination of colored or branded decorative washers and hardware, contrasting hardware placement, edge finishing, product photography, and packaging. Buck's claims the overall nonfunctional presentation, not the utilitarian function of any washer, fastener, clip, or holster component. Buck's alleges that it was first in the relevant holster market to adopt and promote this coordinated use of contrasting colored brads and decorative washers at prominent fastening locations. The claimed ornamental combination includes the choice and arrangement of colors and finishes in relation to the holster body, patterns, clips, claws, and attachments.

26. Since 2020, Buck's has sold Kore Essentials belts. In 2026 it obtained branded Kore belt buckles. Since 2025 it has maintained an authorized Olight dealer

relationship. Buck's also maintains identifiable dealer accounts and relationships developed through its own effort and goodwill.

**B. Tyson Defendants' Access and Near-Verbatim E-Commerce Copying**

27. Tyson Defendants had ready access to Buck's public eBay storefront, listings, website, social media, and national trade-show displays. The companies sell directly competing products to overlapping customers on the same platforms and at the same events.

28. The earlier eBay About summary is the third eBay Work. It describes Buck's as a Florida-based premium holster company established in 2016, then addresses materials, reliable and comfortable holsters, expansion of its product library, Kydex and hybrid construction, leather combined with a Kydex shell, durability, claw attachments, and an American-made lifetime guarantee. Exhibit A-009 (binder page 11) shows Buck's earlier profile, paired with Tyson's profile at A-010 (binder page 12); Exhibit G-9 supplies a corresponding comparison. An archived July 17, 2025 capture of Buck's eBay store contains this wording, establishing online availability by that date without establishing the exact first-publication date.

29. Tyson Defendants' eBay profile follows the same expressive order and syntax, stating that Tyson Holsters is a Virginia-based premium holster company established in 2021; uses the highest-quality materials and controls

to produce a reliable, comfortable holster that can stand the test of time; and continuously expands its product library as new firearms hit the market.

30. The parallel continues through material, durability, claw-attachment, American-made, and lifetime-guarantee statements. The similarity is not explained by product function because Tyson Defendants copied the organization and phrasing while substituting Tyson Defendants' facts and name.

31. The first two eBay Works are the CANIK PRIME light-bearing IWB advertisement and the SIG SAUER P365X MACRO AXG LEGION IWB advertisement. Buck's CANIK text appears at Exhibit A-003 (binder page 5), paired with Tyson's CANIK text at A-004 (binder page 6). Buck's SIG text appears at A-005 (binder page 7), paired with Tyson's SIG text at A-006 (binder page 8). The Bucks versions share substantial prose but differ in product heading and details, including a 30-Day guarantee and .080-inch Material in the CANIK version and a 14-Day guarantee and .080 Kydex in the SIG version. Each accused version is compared with the corresponding Bucks work; the shared prose is not alleged to become independently authored merely by reuse in another listing.

32. Tyson Defendants' corresponding listing opens: "At Tyson Holsters®, we handcraft premium-quality, minimalist holsters specifically designed for inside-the-waistband (IWB) or outside-the-waistband (OWB) carry, as well as

chest rigs and tactical dropleg holsters. Built for superior comfort and concealment, each holster features the most effective concealment claw in the industry—the USA Made Modwing—strategically engineered to reduce or eliminate printing by leveraging your waistband to tuck the firearm grip closer to your body."

33. Buck's listing next states: "Using only top-tier materials and refined manufacturing techniques, we produce what we believe to be the most reliable and comfortable concealment holsters available today. Every holster is meticulously hand-molded using the actual firearm model to ensure a precise, secure fit." Exhibit G-2.

34. Tyson Defendants' listing repeats that sequence and materially the same wording: "the best, top-tier materials and refined manufacturing techniques," "the most reliable and comfortable concealment holsters available today," and "meticulously hand-molded using the actual firearm model to ensure a precise, secure fit."

35. Both listings then proceed through the same ordered details: FOMI clip size and engraving; up to 15 degrees of cant; .080 material; beveled, sanded, and polished edges; heat forming; a glass-like interior; adjustable retention; red-dot accommodation; a raised sight channel; a money-back guarantee; and a lifetime warranty. Bucks uses a 1.5-inch clip and Tyson a 1.75-inch clip; Tyson adds Boltaron and other product-specific language. The claim concerns

original prose taken as a whole, not exclusive rights to these specifications. Exhibit G-2 and G-8.

36. Buck's uses the slogan, "Because at Buck's Holsters, we don't just build holsters... we build confidence." The existing eBay exhibits render the company name without an apostrophe and the opening word in lower case: "because at Bucks Holsters, we don't just build holsters... we build confidence" (the "Buck's Slogan"). Tyson Defendants' corresponding closing states: "because at Tyson Holsters®, we don't just build holsters, we build quality." These uses appear in Exhibit A, pages A-003 through A-006 (binder pages 5-8), and the corresponding comparisons in Exhibits G-2 and G-8.

37. Buck's first publicly used the Buck's Slogan in commerce in January 2026 in its eBay advertising and listings offering its holsters for sale. Buck's used the slogan before Tyson Defendants adopted the accused wording. The January 2026 date concerns this slogan and accompanying listing copy, not the earlier commencement of the BUCKS HOLSTERS business or every historical eBay profile.

38. Within days of Buck's first publication and commercial use in January 2026, Tyson Defendants copied the accompanying advertising prose and adopted the imitative slogan in their competing eBay listings. They substituted Tyson Holsters for Bucks Holsters and quality for confidence while retaining the

distinctive sentence construction and placing the imitation at the same concluding point of substantially copied product-description text.

39. Buck's adopted and uses the complete Buck's Slogan as a recurring brand signature identifying Buck's as the source of the advertised holsters and associated goodwill. Its use across the CANIK and SIG listings is shown in Exhibit A. Buck's claims rights in the composite slogan as used to identify source, not in the word holsters, a general promise of quality, or the abstract idea that a product inspires confidence.

40. The complete Buck's Slogan is distinctive and suggestive when used for holsters: the figurative expression we build confidence requires a mental association between the physical product and the user's confidence rather than directly stating a product specification. Buck's asserts priority based on its earlier commercial use and the goodwill associated with that use, rather than on a pending registration application.

41. Tyson Defendants used the accused slogan without Buck's consent to advertise and sell directly competing holsters through the same eBay marketplace to overlapping purchasers. In the context of the substantially copied surrounding prose and parallel placement, the similar wording and commercial impression are likely to cause purchasers to believe that the parties' goods or businesses are affiliated, sponsored, approved, or otherwise connected, despite the substituted company name and final word.

42. The short interval between Buck's first use and Tyson Defendants' imitation, together with the extensive reproduction of the surrounding advertising text, supports Buck's allegation of deliberate adoption with knowledge of Buck's prior use. Upon information and belief, Trevin Tyson personally directed, approved, or participated in adopting and publishing the accused slogan for T5. The slogan claims concern confusion about the source, sponsorship, or affiliation of goods, not merely a failure to credit the author of advertising copy.

43. Tyson Defendants reproduced Buck's listing titles and descriptions with the company name and limited product-specific facts substituted. Titles, prices, and standard eBay controls are offered as context, not as independently protected copyright works. The product photographs in Exhibit G-1 depict different branded holsters; those screenshots alone do not establish that Tyson copied a Bucks photograph. Exhibits A and G-1 through G-2.

44. Tyson Defendants further copied the selection, order, and pricing of numerous online product options. Representative identical option prices include a Modwing claw at $4.99, an extra FOMI attachment at $2.99, a metal/DCC clip at $4.99, an UltiClip at $12.99, soft loops at $9.99, and a custom-image option at $19.99.

45. Tyson Defendants adopted overlapping product taxonomy and configurator fields, including firearm make and model, hand, Kydex color, custom pattern

or image upload, additional customization, washer color, attachment options, claw, and wedge. The historical comparisons include Buck's Flex Sidecar, Lil Buck IWB, and Antler OWB offerings and Tyson Defendants' corresponding sidecar, IWB, and OWB presentations. The compared descriptions follow similar progressions through concealment, adjustable firearm and magazine retention, material thickness, edge finishing, optics and sight accommodation, and guarantees. The paddle-attachment descriptions also follow a closely corresponding sequence concerning easy attachment and removal, slots for cant adjustment, security and locking beneath the belt, and a curved backing for comfort. Buck's relies on the combined wording, sequence, and presentation as evidence of imitation, rather than claiming exclusive rights in these functional features or standard platform controls.

46. The website policy pages share wording concerning frequent hardware checks, loss of "screws and/or backings," repair or replacement, immediate customer contact, correction of a problem, and customer satisfaction. Their paragraph order differs: Buck's begins with its lifetime warranty, whereas Tyson begins with shipping and return restrictions. Buck's alleges copying of its original wording to the extent protectable, not ownership of warranty terms, return rules, safety instructions, or stock platform text. Exhibits B, G-3, and G-10.

47. The earlier Buck's eBay profile and Tyson's profile share the progression from company introduction to material quality, durability, claw recommendation, and American-made lifetime-guaranteed products. A later Bucks profile has materially different prose while Tyson's profile retains wording corresponding to the earlier Bucks version. Buck's alleges that its use of the earlier profile preceded Tyson Defendants' corresponding use. Exhibit G-4 through G-5 and G-9. Bucks also alleges historical website copying before its redesign, rather than identical current sites. Exhibit I-001 through I-004 supplies additional reproductions of the SIG advertisement and earlier About-profile comparisons; these reproduce the same underlying comparisons rather than additional copyrighted works.

## C. Copying of Employment Advertising

48. Buck's created and posted an Indeed employment advertisement for its Cape Coral operation. Its account screenshot displays "Date posted: May 28, 2024." The advertisement described buffing, drilling, cutting, and routing holster shells; occasional sales and social-media work; growth and planned expansion; attention to detail, problem solving, creative thinking, firearm knowledge, a clean-record requirement, advancement opportunities, and the closing invitation, "Come grow with our team!" Exhibit F-2.

49. Subsequently, after obtaining access to Buck's advertisement, Tyson Defendants published an Indeed Manufacturing Associate advertisement for

Tyson Holsters that reproduced substantially the same cluster and progression of duties and recruiting concepts, as well as materially similar phrasing. The Tyson posting repeated the buffing, drilling, cutting, and routing duties; occasional sales and social-media work; fast-growth and expansion language; attention-to-detail, problem-solving, creative-thinking, firearm-knowledge, clean-record, and advancement language; and the same "Come grow with our team!" closing. Exhibit F-1.

50. The Tyson posting made limited substitutions and additions, including identifying Tyson Holsters and the Greater Richmond Region, adding forming work and a drug-free-workplace statement, changing "gun knowledge" to "firearm knowledge," and moving the clean-record requirement. Those edits leave intact the substantially similar selection, coordination, arrangement, and longer narrative expression of Buck's earlier advertisement.

51. Buck's does not claim copyright protection in isolated functional duties, job requirements, ideas, facts, or short phrases. Buck's alleges copying of its original expression and the particular selection, coordination, and arrangement of the advertisement as a whole. The repeated overlap also supports an inference of access and intentional copying when considered with the other copying alleged in this complaint.

52. Upon information and belief, Tyson personally selected, directed, published, and/or caused T5 to publish the employment advertisement. Exhibits F-1 and F-2 compare Tyson's advertisement with Buck's earlier advertisement. Buck's alleges this copying as further evidence of Tyson Defendants' continuing course of imitation and appropriation and as part of the competitive conduct alleged in this complaint, regardless of whether Buck's seeks copyright registration for the employment advertisement. The Indeed advertisement is not asserted as a separate copyrighted work in Count I.

**D. Copying of Trade Show and Promotional Presentation**

53. Approximately six months after Buck's used its Harrisburg display, Tyson Defendants presented a materially similar booth at the GOALS event in Iowa. The comparison shows both booths using tall 3D fan display devices in corresponding positions near the customer-facing perimeter. Exhibit C.

54. The later Tyson booth reproduced the overall arrangement of Buck's presentation: branded table skirts enclosing a customer-facing display area; a large rear wall dominated by the company identifier and repeating smaller brand elements; coordinated signs and surface treatments; and the same type of tall 3D fan display devices framing the booth.

55. The side-by-side photographs show similarity in composition and customer-facing impression despite the different word marks. Tyson Defendants had

numerous alternative ways to arrange and brand a trade-show booth and did not need to adopt Buck's combination to display functional products.

56. After Buck's introduced its booth fans and branded nylon merchandise bags, Tyson Defendants adopted materially similar devices and bags, together with parallel banners, gun-show signage, staff shirts with an altered color scheme, and printed promotional materials. Buck's identifies marketing bags and printed materials as among the earliest alleged copying events. The messages refer to Buck's "little white handbags," watching for a Buck's bag, and Ross seeing "a Tyson Holsters bag." These allegations concern the claimed overall commercial presentation; ownership of common devices or isolated colors is not asserted. Exhibits C and D.

57. Tyson Defendants' social-media materials have repeated Buck's images, styles, backgrounds, and color choices, including a recent product post using a visual concept associated with Buck's marketing.

58. Buck's alleges that Tyson Defendants adopted materially similar colored brads, decorative washers, hardware combinations, holster presentation, and packaging immediately after Buck's introduced and promoted its coordinated ornamental presentation, and used those combinations in competing holsters and promotional images.

### E. Targeting of Buck's Relationships and Personnel

59. Tyson monitored Buck's booth and personnel at trade shows and specifically waited until Ross or other Buck's management personnel left the booth before approaching and confronting Buck's representatives. During those encounters, Tyson asked representatives about their compensation, solicited contact information, and attempted to recruit them. Buck's reports that this solicitation extended to every one of its employees who worked a gun show that Tyson attended, including questions about pay and efforts to recruit them.

60. Tyson's messages document the purpose and method. He tracked Buck's personnel and activities at Florida shows, stated "Ross left his booth lol," directed that questions about compensation and show revenue not be discussed by text, asked a recipient to obtain employee contact information, and wrote, "So now we need to work on stealing Erin away from Ross secretly for that beer lol."

61. Other messages state, "Make sure to get erins number," direct the recipient to ask how annoyed Ross was about seeing Tyson at every Florida show, and track whether Ross was sitting, using his phone, or away from the booth. These communications support Buck's allegation that the approaches were timed to occur outside the presence of Buck's owner or management.

62. At The Oaks show in 2023, Ross confronted Tyson about his conduct toward Bucks employees. The client reports a near-physical altercation and that Tyson

approached Bucks' booth in front of witnesses and customers and attempted to provoke further confrontation.

63. A former T5 territory sales executive documented Tyson's monitoring of Buck's personnel and show activity. Bucks also reports documentation that Tyson intended to attend every show Bucks attended, even at a financial loss, to upset Ross. The Bruce Jessop communications and Tyson messages in Exhibit D supply additional context for the monitoring and recruitment allegations. Buck's reports that the former employee's account described these plans as efforts to undermine Buck's growth.

64. Tyson Defendants have also attempted to divert identifiable dealer accounts from Buck's, including continuing solicitations after the accounts stated they were not interested.

65. Buck's has sold Kore Essentials belts since 2020 and obtained branded Kore buckles in 2026. It alleges that Tyson abandoned his own belt line to sell Kore products and subsequently sought branded Kore buckles. Buck's has been an authorized Olight dealer since 2025 and alleges that Tyson later pursued that status. Tyson also hired a former Bucks worker. Selling competing products, seeking nonexclusive dealerships, and hiring a competitor's former worker do not alone establish liability; these events are pleaded as context for the specifically alleged improper conduct.

**F. Drumwright's Agency, Publications, and Fort Worth Confrontation**

66. Upon information and belief, Drumwright was and is an agent, representative, and/or apparent agent of T5 and Tyson Holsters. Drumwright represented Tyson Holsters at numerous trade shows, promoted its products, interacted with customers and industry participants on its behalf, and held himself out as authorized to speak and act for Tyson Holsters. T5 and Tyson knew of, permitted, and benefited from that representation.

67. While acting within the course and scope of that agency and in furtherance of Tyson Holsters' business, Drumwright published false statements of fact of and concerning Buck's to third persons, including customers, prospective customers, dealers, vendors, influencers, show promoters, and/or other industry participants.

68. On September 27, 2026, at approximately 1:50 p.m., at Buck's booth during the Fort Worth Gun Show in Fort Worth, Texas, DeMarkus Drumwright orally told Buck's representative Devon O'Grady: "You better tell Ross to lay off my boss. And you and Franco better stop stalking my Facebook or you're gonna catch a lawsuit. You won't like what's gonna come." O'Grady denies that he or Franco had engaged in the alleged Facebook stalking. Drumwright wore a Tyson Holsters badge and referred to Tyson as "my boss." Separately, a text message attributed to Trevin Tyson and dated March 20, 2025, states, "Who knows with all the lies ross tells." Exhibit D-012. These statements are

attributed to their respective speakers; Tyson’s statements are not attributed to Drumwright. Buck's also alleges that Trevin Tyson made false statements about Buck's manufacturing processes and the materials it uses, and made false statements about Buck's business practices to Buck's employees at trade shows. These additional statements are attributed to Trevin Tyson, separately from Drumwright's statements.

69. The statements were false statements of existing fact, not protected opinion, rhetorical hyperbole, or substantially true descriptions. Drumwright knew the statements were false, acted with reckless disregard for their truth or falsity, or at minimum failed to exercise reasonable care before publishing them.

70. The statements were intended and reasonably understood to discredit Buck's in its trade, deter persons from doing business with Buck's, and divert goodwill and sales to Tyson Holsters. To the extent the statements imputed dishonesty, illegality, passing off, or conduct incompatible with Buck's lawful business, they were defamatory per se. Alternatively, they were defamatory per quod and caused special harm.

71. Upon information and belief, T5 authorized, directed, knew of, and/or ratified Drumwright's publications, and the publications occurred within the course and scope of Drumwright's work for Tyson Holsters and at least in part to serve its business interests. T5 is therefore vicariously liable for the actionable publications.

72. On September 27, 2026, at approximately 1:50 p.m., during the Fort Worth Gun Show in Fort Worth, Texas, Drumwright approached Buck's booth while Devon O'Grady was working there for Buck's. O'Grady knew Drumwright as a former Buck's worker who then worked for Tyson. Drumwright was not in uniform but wore a vendor lanyard and a Tyson Holsters badge.

73. Drumwright told O'Grady: "You better tell Ross to lay off my boss. And you and Franco better stop stalking my Facebook or you're gonna catch a lawsuit. You won't like what's gonna come." In context, O'Grady understood the reference to my boss to concern Tyson and the ongoing dispute with Buck's.

74. O'Grady denies that he or Franco had been stalking Drumwright's Facebook or engaging in the conduct Drumwright accused them of committing. Drumwright did not explicitly threaten physical violence. O'Grady nevertheless perceived Drumwright's approach, tone, body language, and delivery as intimidating and became concerned for his personal safety beyond the prospect of a lawsuit. The parties operate in the firearm and holster industry, and this encounter occurred at a gun show. Buck's alleges that the perceived possibility that a person involved in such a confrontation could be carrying a concealed firearm heightened the safety concerns associated with the reported intimidation of its owner, employees, and agents. This allegation concerns the perceived risk arising from the setting and manner of

confrontation; Buck's does not allege that Drumwright or Tyson possessed, displayed, or threatened to use a firearm during the encounter.

75. O'Grady promptly notified the show promoters of the encounter. Event security and police attempted to locate Drumwright but could not find him. According to O'Grady's contemporaneous account, Drumwright was already gone approximately ten minutes later; on information and belief, he apparently departed the show after the confrontation. The encounter required O'Grady to address a security concern while working Buck's booth. O'Grady documented the incident in texts to Ross and in an email sent that evening at 7:17 p.m.

76. At the end of the show, security personnel and police escorted O'Grady from the venue to his car because of the safety concerns following the encounter. The need to report the confrontation, seek security assistance, and obtain an escort interfered with the ordinary conduct of O'Grady's work for Buck's at the event. In his contemporaneous email, O'Grady also reported that the prospect of retaliation by Tyson or his employees had created an ongoing concern for his personal safety while traveling to and working shows. Exhibit H contains a transcription of that email.

77. O'Grady reported that there was no apparent business reason for Drumwright to approach Buck's booth and that it appeared to him Drumwright had entered the show specifically to confront Buck's personnel.

78. Drumwright's instruction that O'Grady tell Ross to 'lay off my boss' expressly connected the encounter to Buck's owner and the business dispute. Considered with the reported threats toward Ross and Tyson's approaches to employees when management was absent, Buck's alleges that these confrontations were intended to intimidate its owner, employees, and agents, discourage continued opposition to the alleged copying, and disrupt the personnel carrying out its business. Buck's claims its own business injury and appropriate relief, not O'Grady's or Ross's individual emotional-distress or assault damages.

**G. Influencer Relationships Confidential Information and Platform Notices**

79. Buck's developed existing and prospective relationships with firearms and holster influencers who promoted or were negotiating to promote Buck's products. The relationships were identifiable, ongoing, and reasonably likely to produce economic benefit.

80. Tyson knew about Buck's relationship or negotiations with at least one influencer and intentionally induced that influencer to stop or reduce work with Buck's and work with Tyson Holsters instead. Tyson also interfered with other influencers after learning that Buck's was negotiating with them.

81. Buck's employees and contractors had access to nonpublic information concerning product development, manufacturing processes, supplier terms, dealer and customer contacts, pricing strategy, unreleased marketing plans, influencer negotiations, and show strategy. Buck's treated qualifying

information as confidential and restricted access through need-to-know practices, passwords, confidentiality instructions, and agreements where applicable.

82. Tyson approached and cornered Buck's employees at trade shows after waiting for Ross or other management personnel to leave the booth, questioned the employees about Buck's business, compensation, personnel, products, and operations, and attempted to recruit them. On information and belief, those contacts were intended in part to obtain Buck's nonpublic competitive information and relationships.

83. On information and belief, Tyson Defendants acquired, used, disclosed, or threatened to use Buck's confidential information through improper employee solicitation or through persons owing duties to Buck's.

84. On information and belief, Tyson Defendants submitted notices or reports to X and other social-media platforms targeting Buck's content. The notices caused or threatened removal, restriction, reduced distribution, or disruption of Buck's content and accounts. Buck's alleges that these reports were directed at suppressing its competitive visibility and disrupting its communications with customers and influencers.

85. Buck's alleges that Tyson Defendants knowingly and materially misrepresented that Buck's content was infringing even though Tyson Defendants had copied Buck's earlier content. Count X addresses the alleged

copyright takedown misrepresentations under 17 U.S.C. § 512(f). Buck's also relies on the allegedly false or misleading platform reports in support of its FDUTPA and unfair-competition claims.

### H. Intent Individual Participation Confusion and Harm

86. The repeated similarities across the three eBay Works are the central copyright allegations. Additional examples involving website and policy language, employment advertising, merchandising, trade-show booths, 3D fan displays, branded nylon bags, signs, shirts, and social media support Buck's allegation of a continuing effort to track, imitate, and appropriate its work and goodwill. The reported intimidation of its owner, employees, and agents supplies further context concerning motive, pressure, and the risk of recurrence. These circumstances do not substitute for proof of ownership, protectable expression, access, and actionable copying of each eBay Work, and are not asserted as independent copyright violations in Count I.

87. Tyson personally controlled the Tyson Holsters business, monitored Buck's owner and personnel at events, timed approaches to Buck's representatives for periods when Buck's management was away from the booth, communicated about Buck's employees, and personally directed, authorized, approved, or participated in the challenged copying and competitive conduct. Tyson is therefore sued individually for his own acts and participation, not

merely because of his ownership or position with T5. T5 and Tyson acted jointly and for their common economic benefit.

88. The parties sell the same category of products through the same online and event channels to overlapping consumers. Tyson Defendants' copying causes consumers, dealers, and prospective employees to encounter materially similar language and commercial presentation from direct competitors.

89. The similarities are likely to cause confusion regarding affiliation, sponsorship, origin, approval, or whether Buck's and Tyson Holsters share a source, business system, or authorized relationship.

90. Buck's alleges injury from unauthorized use of its eBay Works, diverted sales and opportunities, impairment of goodwill, and reasonable investigation and corrective expenses, in amounts and with causation to be proved. The confrontations also disrupted the ordinary work of its representatives, including O'Grady's need to report the Fort Worth incident, seek security assistance, and obtain a police/security escort. Any monetary recovery for business disruption will be limited to Buck's proven loss, separately traced to the responsible defendant and applicable cause of action, without duplication or recovery of personal injuries belonging to nonparty individuals.

91. The recurring copying and confrontations support Buck's allegation of a continuing threat to its protected expression and business operations. Buck's seeks relief tailored to the infringement and other actionable conduct

established by the evidence, including protection against unlawful threats or intimidation used to interfere with its business relationships. It does not seek to prohibit lawful competition, protected speech, good-faith litigation, or mere attendance at the same trade shows.

**COUNT I COPYRIGHT INFRINGEMENT OF THE THREE EBAY WORKS**

**17 U.S.C. Sections 106 and 501 Against T5 Investments LLC and Trevin Tyson**

92. Buck's realleges paragraphs 6 through 21 and 27 through 42 as the ownership, access, and copying allegations for this count. Paragraphs 43 through 91 are incorporated only to the extent relevant to context, intent, individual participation, business injury, or equitable relief; they do not add independent copyrighted works to this count.

93. The asserted works are limited to the three eBay Works identified separately in paragraph 95. Buck's claims their original human-authored prose and any protectable expressive selection and arrangement, excluding facts, ideas, product specifications, functional features, stock language, platform content, general layout, and short phrases or slogans standing alone. The slogan's source-identifying use is separately addressed in the trademark counts. Other website, policy, Indeed, photograph, graphic, booth, bag, fan, and social-media examples are supporting circumstances, not additional works for which copyright relief is sought under this count.

94. Buck's owns the copyrights in the original text of the eBay Works. Each registration identifies BUCKS HOLSTERS, LLC as both author and copyright claimant, identifies the authorship as text, and identifies the work as made for hire.

95. The United States Copyright Office approved registration of each of the three eBay Works on October 14, 2026, with an effective date of registration of October 10, 2026. Registration has therefore been made for each work as required by 17 U.S.C. § 411(a). Copies of the Copyright Office's unofficial certificate previews reflecting the approved registrations are attached as Exhibits J-1 through J-3. The registered works and corresponding accused copies are identified below.

(a) CANIK advertising work: BUCK HOLSTERS-CANIK PRIME EBAY AD COPY, Registration No. TXu 2-569-556; Service Request No. 1-15279155751; application date and effective date of registration October 10, 2026; registration decision date October 14, 2026; year of completion 2026. Exhibit J-1. This work corresponds to Buck's CANIK PRIME WITH OLIGHT BALDR MINI OR PL-2 VALKYRIE LIGHT IWB ad at Exhibit A-003 and the accused Tyson copy at Exhibit A-004.

(b) SIG advertising work: BUCKS HOLSTER EBAY AD COPY SIG SAUER, Registration No. TXu 2-569-554; Service Request No. 1-15279507946; application date and effective date of registration October 10, 2026; registration decision date

October 14, 2026; year of completion 2026. Exhibit J-2. This work corresponds to Buck's SIG SAUER P365X MACRO AXG LEGION (FITS GEN 1 & 2) IWB ad at Exhibit A-005 and the accused Tyson copy at Exhibit A-006. The CANIK and SIG versions contain overlapping prose, as described in paragraph 31.

(c) Earlier About summary: BUCKS HOLSTERS EBAY STORE BACKGROUND, Registration No. TXu 2-569-552; Service Request No. 1-15279508090; application date and effective date of registration October 10, 2026; registration decision date October 14, 2026; year of completion 2025. Exhibit J-3. This work corresponds to Buck's eBay background profile beginning with its Florida-based company description at Exhibit A-009 and the accused Tyson copy at Exhibit A-010, with comparison at Exhibit G-9.

96. Tyson Defendants had access to each eBay Work through Buck's publicly available storefront and listings and their monitoring of Buck's. The CANIK and SIG comparisons show closely corresponding multi-sentence descriptions and progression through comfort and concealment, materials and fit, clip/cant and finishing, retention/optics/sights, and guarantees. The earlier About comparison shows corresponding company introduction, reliability, product-library growth, materials/durability, claw recommendation, and closing guarantee. Buck's alleges substantial similarity of the protectable expression of each identified work, after excluding unprotectable matter, based on the specific paired exhibits in paragraph 95.

97. Without Buck's authorization, Tyson Defendants reproduced and publicly displayed the protectable expression of the eBay Works in competing Tyson Holsters listings and the Tyson seller profile, including the copies identified in paragraph 95. Buck's asserts infringement of its applicable exclusive rights under 17 U.S.C. § 106 through those acts. The additional copying comparisons corroborate the alleged course of conduct without enlarging the copyrighted subject matter asserted in this count.

98. The repeated company-name substitutions and corresponding passages in the three eBay comparisons support an inference of deliberate copying rather than independent creation. Buck's relies on the additional copying examples and the described monitoring and intimidation as corroborating circumstances to the extent relevant and admissible, not as a substitute for proving infringement of each eBay Work. Willfulness is alleged subject to the evidence of knowledge and chronology; neither similarity nor the number of registrations establishes entitlement to statutory damages or fees.

99. Upon information and belief, Tyson personally selected, directed, approved, published, or caused publication of the accused eBay advertising and seller-profile text while operating and directing T5's competing business. His personal monitoring of Buck's and participation in the conduct alleged above support the allegation of involvement; individual copyright liability is sought

for the infringing acts he personally committed or directed, not merely because he owns or manages T5 or participated in a separate confrontation.

100. Buck's seeks an injunction under 17 U.S.C. § 502, impoundment and disposition under § 503, actual damages and attributable profits under § 504(b), and costs and attorney's fees as legally available. Buck's seeks statutory damages under § 504(c) and attorney's fees under § 505 only to the extent available under § 412 and the other applicable provisions of the Copyright Act. Buck's seeks no duplicate recovery for overlapping expression in the CANIK and SIG works or for the same injury under multiple counts.

**COUNT II TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION**

**15 U.S.C. Section 1125(a)(1)(A) Against T5 Investments LLC and Trevin Tyson**

101. Buck's realleges paragraphs 6 through 19, 20 through 27, 44 through 45, 53 through 58, and 86 through 91, limited to facts relevant to this count, as if fully set forth here.

102. Buck's owns protectable rights in the specific overall combinations of nonfunctional visual and merchandising elements alleged in paragraphs 20 through 25 and 53 through 58, including its coordinated trade-show presentation, tall 3D fan display devices, branded nylon giveaway bags and packaging, holster presentation, colored and branded hardware treatment, and consistent online purchasing presentation.

103. Buck's does not claim exclusive rights in functional holster features, Kydex thickness, claw mechanisms, washers or fasteners as such, individual tables, ordinary banner formats, common product categories, or isolated colors. It claims the source-identifying overall combinations after excluding functional and generic matter.

104. The claimed source-identifying ornamentation is not essential to the use or purpose of the goods, does not affect their cost or quality, and does not place competitors at a significant non-reputation-related disadvantage. Bucks excludes functional fastening, carrying, display, and ordering features.

105. Through substantially exclusive and continuous use, national trade-show exposure, online sales, advertising, coordinated promotion, and customer recognition, the claimed combinations have become associated with Buck's.

106. Tyson Defendants adopted materially similar combinations after access to Buck's presentation, including corresponding 3D fan displays and branded nylon merchandise bags, and used them for directly competing goods in the same channels.

107. Tyson Defendants' use is likely to cause confusion, mistake, or deception as to affiliation, connection, association, origin, sponsorship, or approval, in violation of 15 U.S.C. § 1125(a)(1)(A).

108. Tyson Defendants acted intentionally and with knowledge of Buck's prior use, supporting enhanced relief to the extent permitted by 15 U.S.C. § 1117.

109. Buck's is entitled to injunctive relief under 15 U.S.C. § 1116 and to Tyson Defendants' profits, damages, costs, and other relief under 15 U.S.C. § 1117.

**COUNT III FALSE DESIGNATION OF ORIGIN AND FALSE ASSOCIATION**

**15 U.S.C. Section 1125(a)(1)(A) Against T5 Investments LLC and Trevin Tyson**

110. Buck's realleges paragraphs 6 through 19, 20 through 27, 36 through 45, 53 through 58, and 86 through 91, limited to facts relevant to this count, as if fully set forth here.

111. Tyson Defendants used in commerce a coordinated combination of copied source-identifying presentation, imagery, merchandising structure, 3D fan displays, branded nylon merchandise bags, and promotional materials in connection with competing goods. Their imitation also includes the Buck's Slogan, used as a recurring source-identifying signature in the circumstances described above.

112. This count does not rest solely on Tyson Defendants' failure to credit Buck's as the author of communicative content. It rests on Tyson Defendants' use of copied commercial indicia to create a false or misleading association, affiliation, sponsorship, or approval in the market for competing holsters.

113. Because the parties sell the same products through the same online platforms and trade shows, Tyson Defendants' coordinated imitation is likely

to confuse consumers, dealers, and promoters concerning the relationship between Buck's and Tyson Holsters.

114. Tyson Defendants' conduct was knowing and intentional, as shown by the repeated name substitutions, revision tracking, cross-channel copying, and Tyson's direct monitoring of Buck's activities.

115. Buck's suffered injury to sales, goodwill, and control of its commercial identity.

116. Buck's is entitled to relief under 15 U.S.C. §§ 1116 and 1117.

**COUNT IV FLORIDA COMMON LAW UNFAIR COMPETITION**

**Against T5 Investments LLC and Trevin Tyson**

117. Buck's realleges paragraphs 6 through 19, 20 through 27, 28 through 91, limited to facts relevant to this count, as if fully set forth here.

118. Buck's established protectable goodwill and a distinctive commercial identity through its original content, coordinated online merchandising, promotional materials, holster and packaging presentation, branded nylon merchandise bags, 3D fan displays, and overall trade-show presentation. That identity includes the Buck's Slogan and the goodwill arising from its prior commercial use.

119. Tyson Defendants knowingly appropriated material aspects of that identity, including the Buck's Slogan, the online and Indeed advertising presentation,

the fan displays and nylon merchandise bags, and used them in direct competition while targeting Buck's influencers, employees, accounts, and relationships.

120. The challenged conduct is likely to deceive or confuse the relevant public and constitutes unfair competition and misappropriation of Buck's goodwill under Florida common law.

121. Buck's has been damaged and is entitled to injunctive relief, damages, disgorgement as available, costs, and other appropriate relief.

**COUNT V FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**Florida Statutes Sections 501.201 Through 501.213 Against T5 Investments LLC and Trevin Tyson**

122. Buck's realleges paragraphs 6 through 19, 20 through 27, 28 through 91, limited to facts relevant to this count, as if fully set forth here.

123. Tyson Defendants' deliberate copying of Buck's commercial content, employment advertising, and presentation, use of that imitation to market their business and recruit employees, interference with market relationships, and knowingly false or misleading platform reports constitute unfair or deceptive acts or practices in trade or commerce under Fla. Stat. § 501.204. In particular, the knowing use of an imitative source-identifying slogan in

substantially copied eBay listings is likely to mislead purchasers about commercial affiliation or sponsorship.

124. The conduct is consumer-oriented and affects the public interest because it occurs in consumer-facing listings, websites, social-media advertising, and trade shows and is likely to mislead consumers about source, affiliation, and the origin of Tyson Defendants' commercial presentation.

125. Buck's seeks only legally recoverable actual damages proximately caused by the pleaded deceptive practices.

126. Buck's is entitled to declaratory and injunctive relief under Fla. Stat. § 501.211, actual damages under § 501.211(2), and attorney's fees and costs under § 501.2105, subject to proof and applicable limitations.

**COUNT VI DEFEND TRADE SECRETS ACT**

**18 U.S.C. Section 1836 Against T5 Investments LLC and Trevin Tyson**

127. Buck's realleges paragraphs 6 through 19, 59 through 65, 79 through 83, and 87 through 91, limited to facts relevant to this count, as if fully set forth here.

128. Buck's owned trade-secret information related to products and services used in, or intended for use in, interstate commerce, including the nonpublic product-development, manufacturing, supplier, customer, pricing, marketing, influencer-negotiation, and show-strategy information described in paragraph 81.

129. The information derived independent economic value from not being generally known or readily ascertainable by proper means, and Buck's took reasonable measures to keep it secret.

130. Tyson Defendants knew or had reason to know that the information belonged to Buck's and was obtained through improper means or through a person owing a duty to maintain its secrecy or limit its use.

131. Tyson Defendants acquired, disclosed, used, or threatened to use the trade secrets without consent through the solicitation and hiring of one or more of Buck’s employees.

132. The misappropriation is related to products and services used in interstate commerce and caused actual or threatened injury to Buck's.

133. Buck's is entitled to injunctive relief and damages under 18 U.S.C. § 1836(b)(3), subject to the statute's limits on restraints affecting employment and lawful skill and knowledge.

134. Because the alleged conduct was willful and malicious, Buck's seeks exemplary damages and attorney's fees to the extent authorized by law.

## COUNT VII FLORIDA UNIFORM TRADE SECRETS ACT

## Florida Statutes Sections 688.001 Through 688.009 Against T5 Investments LLC and Trevin Tyson

135. Buck's realleges paragraphs 6 through 19, 59 through 65, 79 through 83, and 87 through 91, limited to facts relevant to this count, as if fully set forth here.

136. The information identified in Count VI constitutes trade secrets under Fla. Stat. § 688.002(4) because it derived independent economic value from secrecy and was subject to reasonable efforts to maintain secrecy.

137. Tyson Defendants acquired, disclosed, used, or threatened to use the trade secrets through improper means or with knowledge of a duty limiting their use.

138. Tyson Defendants' conduct constitutes misappropriation under Fla. Stat. § 688.002(2).

139. Buck's has suffered actual loss, Tyson Defendants obtained unjust enrichment, and further use threatens irreparable harm.

140. Buck's is entitled to injunctive relief and damages under Fla. Stat. §§ 688.003 and 688.004.

141. Buck's seeks exemplary damages and reasonable attorney's fees under Fla. Stat. §§ 688.004(2) and 688.005 if willful and malicious misappropriation is established.

## COUNT VIII TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

### Against T5 Investments LLC and Trevin Tyson

142. Buck's realleges paragraphs 6 through 19, 59 through 83, and 87 through 91, limited to facts relevant to this count, as if fully set forth here.

143. Buck's had existing and prospective business relationships with identifiable influencers, including at least one influencer Tyson Defendants successfully diverted and others negotiating with Buck's; with employees and show staff; and with identifiable dealer accounts. Those relationships afforded Buck's legal rights or a reasonable expectation of economic benefit.

144. Tyson Defendants knew of those relationships through the parties' dealings, Tyson's monitoring of Buck's shows and personnel, communications with the influencers, encounters at Buck's booth, and approaches to Buck's existing accounts.

145. Tyson Defendants intentionally and unjustifiably interfered with the identified relationships through the false statements, threats, and misuse of confidential information alleged above.

146. Tyson's statement that his team should work on "stealing Erin away from Ross secretly" and related requests for her number support an inference of targeted recruitment. Exhibit D.

147. At least one influencer relationship was disrupted, other negotiations were impaired, and Buck's incurred lost promotional value, sales, retention costs, and other damages.

148. The interference caused disruption, investigation and retention costs, lost or delayed opportunities, and other damages to be proven at trial.

149. Tyson Defendants acted intentionally, willfully, maliciously, and in concert, entitling Buck's to compensatory damages, punitive damages to the extent permitted by law and properly pleaded, injunctive relief, and other relief.

**COUNT IX DEFAMATION AND DEFAMATION PER SE**

**Florida Common Law Against DeMarkus Drumwright and T5 Investments LLC d/b/a Tyson Holsters**

150. Buck's realleges paragraphs 6 through 19, 66 through 71, and 90, limited to facts relevant to this count, as if fully set forth here.

151. Drumwright published to one or more third persons the false statements of fact identified above concerning Buck's and its products, sourcing, originality, honesty, and/or business practices.

152. The publications were of and concerning Buck's. Buck's alleges that, in context, statements naming Ross referred to his conduct in operating Buck's and were understood by their audience to concern Buck's business. Ross does not assert an individual claim in this pleading.

153. Drumwright knew the statements were false, acted with reckless disregard for their truth or falsity, or at minimum acted negligently in failing to determine their truth before publication.

154. The statements were defamatory because they tended to harm Buck's reputation, lower Buck's in the estimation of customers and industry participants, and deter third persons from dealing with Buck's.

155. To the extent the statements charged Buck's with dishonesty, illegality, passing off, false country-of-origin claims, or conduct incompatible with the proper exercise of its lawful trade, the statements constituted defamation per se. In the alternative, the statements constituted defamation per quod and caused the special damages identified above.

156. Upon information and belief, Drumwright made the statements while acting as T5's agent and representative, within the course and scope of that relationship, and at least in part to further Tyson Holsters' business. T5 authorized, directed, and/or ratified the conduct and is vicariously liable for the actionable publications.

157. As a direct and proximate result, Buck's suffered reputational injury, lost goodwill, lost or diverted sales and opportunities, corrective expenses, and other damages. For any statement proven defamatory per se, Buck's seeks presumed and general damages to the extent permitted by law.

158. Buck's is entitled to compensatory damages and, upon satisfaction of applicable procedural requirements and the required evidentiary showing, punitive damages, together with all other relief permitted by law.

**COUNT X MISREPRESENTATION IN COPYRIGHT TAKEDOWN NOTICES**

**17 U.S.C. Section 512(f) Against T5 Investments LLC and Trevin Tyson**

159. Buck's realleges paragraphs 6 through 19, 84 through 85, and 87 through 91, limited to facts relevant to this count, as if fully set forth here.

160. Tyson Defendants submitted one or more notifications under 17 U.S.C. § 512(c)(3) asserting that Buck's material or activity was infringing.

161. The assertions were materially false because Buck's owned or was authorized to use the challenged material, and Tyson Defendants had copied Buck's earlier material.

162. Tyson Defendants knowingly made the misrepresentations without a good-faith factual or legal basis for the infringement claims.

163. The service provider relied upon the identified knowing material misrepresentation in removing or disabling access to Bucks' material or activity.

164. Buck's incurred damages, costs, lost distribution, and lost sales as a result of the misrepresentations.

165. Buck's is entitled to recover its damages, costs, and attorney's fees under 17 U.S.C. § 512(f).

**COUNT XI UNREGISTERED TRADEMARK INFRINGEMENT OF THE BUCKS SLOGAN**

**Lanham Act Section 43(a), 15 U.S.C. Section 1125(a)(1)(A), Against T5 Investments LLC and Trevin Tyson**

166. Buck's realleges paragraphs 6 through 19, 20 through 21, 27 through 43, and 86 through 91, limited to facts relevant to the Buck's Slogan and the accused use, as if fully set forth here.

167. Buck's owns valid and protectable common-law rights in the Buck's Slogan through its prior use in commerce beginning in January 2026. The complete slogan functions as a source identifier for Buck's holsters and is inherently distinctive and suggestive in the manner alleged above. This count does not depend on issuance of a federal trademark registration.

168. After Buck's first use, and within days of its January 2026 publication, Tyson Defendants adopted and used the accused slogan in commerce in their eBay advertising, offers for sale, and sales of competing holsters. Buck's did not authorize or license that use.

169. The accused slogan retains the core verbal sequence we don't just build holsters, we build and a parallel closing structure, appearing at the same point

in materially copied advertising. Considering the slogans in their entirety and their marketplace context, the common wording, presentation, identical category of goods, overlapping purchasers, common sales channels, and deliberate adoption make confusion as to affiliation, connection, sponsorship, or approval likely. The different business names and final words do not eliminate that likelihood in the alleged context.

170. Tyson Defendants' unauthorized use violates 15 U.S.C. § 1125(a)(1)(A). The injury alleged is consumer confusion about commercial source or affiliation, not an asserted right to attribution as author of the advertising prose. Buck's does not assert actual confusion solely from the fact of copying.

171. Upon information and belief, Trevin Tyson personally directed, authorized, approved, or participated in adoption and publication of the accused slogan, and T5 used it in operating Tyson Holsters. Each is liable for that defendant's own participation in the infringing conduct.

172. The infringement has injured and threatens further injury to Buck's goodwill and control over its source-identifying slogan and is likely to divert sales and commercial opportunities. Monetary loss will be established through evidence of causation and amount. Continued confusing use threatens harm not fully compensable by money damages.

173. Buck's seeks preliminary and permanent injunctive relief under 15 U.S.C. § 1116 and, subject to proof and equitable principles, the liable defendants'

attributable profits, Buck's damages, and costs under 15 U.S.C. § 1117(a). Buck's also seeks compensatory enhancement where authorized and reasonable attorney's fees upon a finding that this is an exceptional case. Buck's seeks no duplicate recovery for the same injury under overlapping counts.

**COUNT XII FLORIDA COMMON LAW TRADEMARK INFRINGEMENT OF THE BUCKS SLOGAN**

**Against T5 Investments LLC and Trevin Tyson**

174. Buck's realleges paragraphs 6 through 19, 20 through 21, 27 through 43, and 86 through 91, limited to facts relevant to this count, as if fully set forth here.

175. By its prior adoption and commercial use beginning in January 2026, Buck's owns common-law trademark rights in the distinctive, source-identifying Buck's Slogan within the markets where Buck's has established legally protectable goodwill, including its Florida market. Those rights precede Tyson Defendants' accused use in those markets.

176. Without authorization, Tyson Defendants used the confusingly similar accused slogan in advertising and offering competing holsters to purchasers in those markets, including Florida purchasers reached by the challenged eBay listings and Florida-directed sales and advertising alleged above.

177. For the reasons alleged concerning the complete slogans, copied surrounding prose, parallel placement, competing goods, common marketplace, and

overlapping purchasers, the accused use is likely to confuse purchasers concerning source, affiliation, sponsorship, or approval and infringes Buck's common-law trademark rights.

178. Tyson Defendants knew of Buck's earlier use and deliberately adopted the imitation within days. Trevin Tyson is individually liable to the extent of his personal direction, approval, or participation in the adoption and use; T5 is liable for its own commercial use and the acts attributable to it.

179. The infringement has damaged and threatens to damage Buck's goodwill and commercial interests. Buck's seeks an injunction limited to its legally protectable rights and markets, compensatory damages, an accounting and disgorgement to the extent available under Florida law, taxable costs, and other appropriate relief, without duplicative recovery.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Bucks Holsters LLC requests that the Court enter judgment in its favor and against the appropriate Defendants, including Trevin Tyson individually for the claims based on his personal conduct and participation, and:

A. Declare that Tyson Defendants infringed Buck's copyrights;

B. Declare that Tyson Defendants violated 15 U.S.C. § 1125(a), Florida common law, and FDUTPA, misappropriated Buck's trade secrets, and

submitted actionable copyright takedown misrepresentations, and that Drumwright and T5 are liable for defamation;

C. Preliminarily and permanently enjoin the reproduction and public display of the protectable expression of the three eBay Works properly asserted under Count I, including substantially similar infringing versions; enjoin the confusingly similar nonfunctional trade-dress combinations proven at trial and confusing use of the accused slogan to the extent of the rights established under Counts XI and XII;

D. Enjoin unlawful acquisition, use, or disclosure of Buck's trade secrets and unlawful interference with its identified business relationships, to the extent established under the applicable counts; any injunction concerning intimidation shall identify the specific unlawful threats or conduct proven, the responsible defendants, and the protected business interests, and shall not restrain lawful speech, good-faith legal proceedings, or ordinary competition;

E. Require removal or revision of the infringing eBay listing and About text and other copies of the same protected expression, within the scope of the rights established; require correction of actionable platform notices and other relief warranted under the separately proven claims; and preserve relevant listing/profile versions, revision records, application/deposit

records, sales data, source files, communications, and evidence of the reported confrontations;

F. Order impoundment and appropriate disposition of infringing copies and materials to the extent authorized by law;

G. Award Buck's actual damages, Tyson Defendants' profits, statutory damages where legally available, and any enhancement authorized by law; any award under Counts XI and XII must avoid duplication with relief under other counts; no statutory counterfeiting damages are requested for the unregistered slogan.

H. Award damages for defamation, trade-secret misappropriation, tortious interference, and takedown misrepresentations, including presumed or general damages for any defamation per se and exemplary or punitive damages if permitted after compliance with applicable pleading and evidentiary requirements;

I. Award prejudgment and postjudgment interest;

J. Award costs and reasonable attorney's fees to the extent authorized by 17 U.S.C. §§ 505 and 512(f), 15 U.S.C. § 1117, 18 U.S.C. § 1836(b)(3)(D), Fla. Stat. §§ 501.2105 and 688.005, or other law; and

K. Award such other legal and equitable relief as the Court deems just and proper.

**JURY DEMAND**

Buck's demands a trial by jury on all issues so triable.

Dated: October 19, 2026

Respectfully submitted,
LOEFFLER IP GROUP, P.A.
5659 Strand Court, Suite 102
Naples, Florida 34110
Telephone: (239) 202-2901
Email: Bryan@lawipgroup.com
By: /s/ Bryan L. Loeffler
Bryan L. Loeffler, Esq.
Florida Bar No. 852341
Counsel for Plaintiff Bucks Holsters LLC